Filed 1/11/22  In re J.A. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> VICTORIA T., <br><br> Defendant and Appellant. | F083051 <br><br> (Super. Ct. Nos. JJV071685A, JJV071685B) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Hugo J. Loza, Judge.

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.

Jennifer M. Flores, County Counsel, John A. Rozum and Abel C. Martinez, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Victoria T. (mother) challenges the order terminating her parental rights (Welf. & Inst. Code, § 366.26)[1] to her two children. Mother contends the juvenile court erred when it found that she failed to meet her burden to establish the beneficial parent-child relationship exception to adoption. We affirm.

## STATEMENT OF THE CASE AND FACTS

### Background

In June of 2018, mother was admitted to a medical center on a psychiatric section 5150 hold, reportedly suffering from postpartum depression. Mother feared she would harm her then 5-month-old child, L.A. A safety plan was put in place for L.A. and 8-year-old J.A. with the children's father David A. (father) and no other action was taken. On July 21, 2018, mother returned to the medical center for a second section 5150 evaluation. She had been overly aggressive and vocal and the following day intentionally poured bleach into father and J.A.'s fish tank, killing their pet fish.

J.A. was taken to a maternal aunt's home where he was interviewed by a social worker and reported that his mother had been aggressive, yelling and cussing, and had hit him several times. He reported an incident in which he was sleeping in a bed when his mother hit him hard and told him to "get the fuck to his room." According to J.A., mother got angry when she did not take her medication on time. J.A. also reported an earlier incident in which mother, who was pregnant with L.A. at the time, hit him across the face, leaving a cut across his face and jaw. J.A. thought mother was trying to be mean when she killed his fish because she knew he and father loved the fish. J.A. expressed that he felt safe with mother and father "sometimes" when his mother gets angry.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Mother confirmed J.A.'s reports and stated she intended to get back at father when she killed the fish. She felt bad when she saw J.A.'s face as he watched the fish dying. The family lived with mother's parents (maternal grandparents).

When father was interviewed, he expressed some confusion about the earlier safety plan and admitted there were times when he left mother alone with the children. At a team meeting at the end of July 2018, it was decided that mother would move out of the home and the children allowed to stay with father. Reunification services for mother and family maintenance services for father would be recommended.

### Detention

The Tulare County Health and Human Services Agency (agency) filed a section 300 petition on July 27, 2018, alleging mother's mental health issues rendered her incapable of safely parenting her children.

At the July 30, 2018, detention hearing, the children were detained from mother's custody and allowed to remain with father. Mother was ordered to receive supervised visits with the children three times a week for two hours each. Jurisdiction and disposition were set for September 17, 2018.

### Jurisdiction/Disposition

The jurisdiction/disposition report stated that father and children were living with maternal grandparents. Maternal grandmother reported that mother's mental health issues caused her moods to fluctuate rapidly and lash out at any relatives, including father, trying to help stabilize her. According to maternal grandmother, father supports mother no matter how angry she becomes. The maternal aunt confirmed that father does anything mother wants, even when she verbally abuses him. The aunt expressed concern that mother could injure the children and father would not protect them. The aunt described mother's relationship with J.A. as "conflicted."

Father claimed not to remember the events of the day when mother killed the fish. He did not believe he had an alcohol abuse issue.

3.

The maternal grandparents sold the home where father and the children lived. Father planned to move in with his own mother until he could find a home on his own.

Mother was living with a maternal great-aunt and believed she was doing better since the agency intervened. While she had been in a romantic relationship with father for 10 years, she no longer wished to be. Mother admitted that she was dependent on maternal grandmother to mediate disputes with father. The social worker advised mother to take responsibility for her own relationships. Mother reported that she was diagnosed with mental illness at age 14 (she was now 27). She journaled to control her emotions and was receiving mental health counseling and taking medication as prescribed.

On September 11, 2018, maternal grandmother called to notify the social worker that mother had gotten into an argument with father and cut her arm to cope with her emotions. She was evaluated for a psychiatric section 5150 hold but did not meet the criteria and was released.

In evaluating the situation, the social worker noted that, in addition to mother's mental health issues, father appeared to have a "co-dependent and dysfunctional relationship with the mother."

J.A. was receiving weekly counseling to address the trauma and disruption to his life.

Mother had been visiting at the agency until supervision was delegated to maternal grandmother, maternal aunt and maternal great-grandmother. For the most part, visits were appropriate, although mother had to be redirected at times. Mother was observed to get frustrated with J.A. when she attempted to help him with his homework. J.A. felt mother was giving L.A. more attention than him.

Jurisdiction/disposition was held September 17, 2018. Mother waived her right to a hearing and submitted on the reports. The juvenile court found the petition true and adopted the proposed finding and orders, removing the children from mother's custody

and granted her reunification services. The children remained with father under family maintenance services. A six-month review was set for March 4, 2019.

***Six-Month Review***

The report prepared for the six-month review recommended that mother receive an additional six months of services as she was participating in the ordered services. Mother and father continued in an "off and on" relationship. Mother's moods continued to be labile, and her counselor was unwilling to start conjoint counseling with father due to potential liability issues.

The report noted that father, who was living with the children, sometimes became overwhelmed and frustrated with the children and once allegedly hit J.A. with a broom.

J.A. now had an individualized education program (IEP) at school and continued to see a therapist weekly. L.A. was too young for either school or counseling.

At the six-month review held March 4, 2019, the juvenile court followed the recommendations of the agency and granted mother an additional six months of services. A 12-month review was set for August 19, 2019.

***12-Month Review***

The report prepared for the 12-month review attached a report from J.A.'s therapist that he had been discharged from therapy because father had not followed through with counseling once school was out for the summer. The agency recommended that services to mother be continued for an additional six months and that the children remain in father's care with family maintenance services.

Father was in the process of moving back into the home the family had previously lived in prior to the agency's intervention.

At the 12-month review hearing August 16, 2019, the juvenile court adopted the recommendations of the agency and granted the social worker discretion to allow mother to move into the home with father and the children "if deemed appropriate."

*Section 387 Supplemental Petition and Section 342 Subsequent Petition*

On September 23, 2019, mother had asked the social worker to "immediately" visit her at father's home. Father was not home and the home was cluttered and dirty. Mother reported that father had been arrested the previous month when he pulled a knife on somebody during a road rage incident. The children were in the car with him at the time. In addition, father had been in a car accident and damaged the car. According to mother, father was minimizing his behaviors in therapy. She further stated that he had begun drinking to "numb his pain because of his dog being sick." Father had berated J.A. Mother played a recording she had made of father yelling and cursing with the children present. Maternal grandmother picked up J.A. for the weekend as "things were bad."

When father returned to the house, he admitted the road rage incident but insisted he did not have anger issues. He denied arguing with mother in front of the children but agreed to attend an anger management program.

On September 27, 2019, the agency decided to allow mother to move into the home with father and the children.

On October 16, 2019, J.A. reported to the social worker that his mother and father yelled at each other a lot and his mother wants father to move out. He also reported that they do not eat until close to his bedtime. J.A. discussed a safety plan of taking L.A. and crawling out the window and going to a friend's house, if necessary, and calling his grandparents.

On December 4, 2019, J.A. described mother and father fighting with "words, hands and fists." According to J.A., the last time they fought, he took L.A. and locked themselves in his room for their "safety." J.A. reported that father often drank beer and he heard that he " 'smokes and grows weed.' "

When interviewed December 13, 2019, mother denied the children were ever physically harmed during an incident of domestic violence, but that during the last

6.

" 'blow up' " she directed J.A. to video record the altercation so she could show it to her therapist.

In an interview December 17, 2019, father admitted to drinking heavily; mother admitted to continued severe mental health symptoms, including suicidal ideation.

J.A.'s school reported that he was often tardy and had not eaten breakfast before arriving. He was very impulsive and recently struck two students, unprovoked. His behavior was affecting other students in his small group. He was often dirty. Mother shared J.A. witnessing domestic violence between his parents.

On December 19, 2019, the agency sought a protective custody warrant and on December 20, 2019, filed both a section 387 supplemental petition and a section 342 subsequent petition, citing father's alcohol abuse and mother's inability to protect the children.

### *Detention*

The children were placed with maternal grandparents and detained by the juvenile court on December 23, 2019. Mailing address forms submitted by mother and father indicated that they continued to live together. Jurisdiction/disposition was set for January 31, 2020.

### *Jurisdiction/Disposition*

The jurisdiction/disposition report for the section 342 and section 387 petitions initially recommended that both mother and father receive six months of reunification services. The report included a December 4, 2019, referral in which the school reported that, when informed of J.A.'s behavior at school, mother reported that it may have been caused by J.A. witnessing domestic violence between mother and father. Mother told the social worker that she and father would work out their differences by "pushing and shoving."

On January 21, 2020, maternal grandmother reported that mother and father initially visited regularly but were now only visiting the children once a week and would

7.

just wave goodbye when it is time to go. Mother and father would tell the children they would visit but then not show up as promised.

Prior to the jurisdiction/disposition hearing, the agency filed an addendum report noting that, by the scheduled date of the hearing, mother would have received 18 months of reunification services and was not eligible for additional services.

At the jurisdiction/disposition hearing, mother and father submitted on the petition. The juvenile court found the allegations of the petitions true and placed the children in out-of-home care. Father was granted services and mother denied services. A six-month review was scheduled for July 24, 2020.

### Six-Month Review

The report prepared for the six-month review recommended that services for father be terminated, noting mother and father had not visited regularly and father had not made substantial progress in his case plan.

J.A. was again in mental health counseling to address his exposure to the domestic violence between mother and father.

Mother and father remained in a relationship and were residing together. Both were employed. They had court ordered visitation of three times per week for two hours each visit. Maternal grandmother, who supervised the visits, stated that mother and father were visiting only once a week for approximately 90 minutes. Of the 60 scheduled visits, each parent attended 20 visits and missed 40 visits. Because the children were placed with family, visits were allowed in person even during the Covid-19 pandemic. Maternal grandmother encouraged father to come even when mother did not, but he did not want to come without mother.

At the six-month review July 24, 2020, the juvenile court did not follow the recommendation of the agency and instead extended services to father for an additional six months. Visits were discussed and mother's counsel requested that visits be twice per week. The juvenile court ordered visits of one time per week for mother and father and

ordered the parents to confirm 24 hours in advance whether they would attend, due to the number of missed visits.  They were informed "to attend all scheduled visitation."  A 12-month review was scheduled for January 19, 2021.

*12-Month Review Hearing*

The report prepared for the 12-month review hearing recommended that services for father be terminated and a section 366.26 hearing be set with adoption as the permanent plan.  According to the report, father had not made substantial progress in his case plan and again neither mother nor father had visited regularly.

The report recounted an incident during an August 5, 2020 domestic violence group Zoom meeting in which mother and father began arguing with each other to the point where the group session was dismissed so staff could counsel mother and ensure her safety.  Just as law enforcement was about to be called, father left the home.

Maternal grandmother reported that mother and father argued, and that mother stated father took cocaine for a toothache.

Father reported that, as of September 24, 2020, mother remained in the home and when her medication "wears out" she starts to become unreasonable and "may get aggressive."

J.A., who was now in the fifth grade, was attending school regularly and completing his assignments.  He continued in weekly mental health sessions to assist with trauma and instability he had experienced.  L.A., who was just barely three, was developing well and was not receiving any remedial services.

Mother and father's visits continued to be sporadic.  Since July of 2020, mother had missed 36 of 60 visits and father had missed 22 of 60 visits.  Maternal grandmother reported an incident that occurred on July 26, 2020, when mother and father wanted the children brought to their house for a swim.  When the children arrived, the house was messy and dirty and there was no water in the pool.  When this was pointed out, father became upset and went back into the house.  He eventually returned, filled the pool, and

joined the children for a swim. But the entire visit lasted only 45 minutes. Later, mother called maternal grandmother and reported that she wanted father arrested because they had gotten into an argument about the pool not being filled.

Maternal grandmother described another 45-minute visit when mother came alone to spend time with the children. However, mother got very frustrated with J.A., who was talking to her about his games. Mother told him she did not want to hear the same thing over and over again and was tired of hearing the same stories. She then went outside and was on her phone. When she came back inside, mother said she had just quit her job. A month later, mother stated she found a new job and did not want to be called or texted. Maternal grandmother offered to take videos of the children and send them to mother. She also urged father to come without mother, but he never did.

In early September 2020, maternal grandmother reported that mother was being verbally aggressive and requested that visits be supervised by someone else. Mother also called the agency and asked that the agency rather than maternal grandmother supervise the visits. The social worker began the process of moving the visits to the agency.

By late September and early October 2020, father was going to maternal grandmother's house and helping J.A. with his homework. However, father then chose to have friends from out of town stay at his home, which meant he cancelled visits for two weeks while he self-quarantined due to possible Covid.

On October 8, 2020, mother and maternal grandmother agreed that maternal grandmother could again supervise visits. Thereafter, mother visited every two weeks.

The CASA filed a report January 15, 2021, relating that J.A. gained weight, which maternal grandmother believed was due to his depression and disappointment when his parents said they would visit and did not show up. At times, J.A. would see that his parents were online, but they would not take his phone calls. When maternal grandmother reported this to mother and father, mother replied that she was asking for "patience as she was on medication." J.A. expressed that, if he and L.A. return home, it

would be his responsibility to care for L.A. He expressed a desire to the CASA that he wanted to go home to his parents and to see his dog.

At a contested hearing February 26, 2021, J.A. was present with counsel. According to J.A.'s counsel, J.A. expressed that visits were important to him, but that mother only visited if she is in a good state of mind and father only visits when mother does. The CASA testified that J.A. was "pretty tightlipped" about visits that had occurred, saying only that they were "good."

The juvenile court noted that, in order to continue services to 18 months, father would need to have visited consistently and regularly, which he had not done, noting he had attended only 38 out of 60 visits, and mother attended 24 out of 60. Services for father were terminated and a section 366.26 hearing set for June 15, 2021. Visitation was ordered to remain at three times per week with the agency given discretion to allow some short unsupervised visits, such as allowing father to walk J.A. to school.

### Section 366.26 Hearing

The report prepared for the section 366.26 hearing recommended termination of parental rights and adoption by the maternal grandparents. An adoption assessment found the children to be adoptable.

J.A. continued in counseling to address his history of trauma and family disruption. He had perfect attendance at school for the past four months. J.A. reported that he was safe with maternal grandmother and wanted to be adopted by her. L.A. was developmentally on track, but too young to provide a statement regarding adoption.

Maternal grandparents wished to adopt both children and provide for them. They had full background check clearance.

Since termination of services, mother attended 25 visits and missed 20; father attended 18 visits and missed 27 visits. Mother was reported to visit twice a week but did not interact with the children much and blamed her job as the reason for not being able to visit as ordered. Father was inconsistent but came once a week early in the morning

11.

before school to help J.A. with his homework. He also came in the evenings but did not stay too long.

The CASA reported that, when she asked J.A. for a "high and low" for one week, J.A. listed his parents not coming for a visit as planned as his low. Maternal grandmother reported to the CASA that she asked the parents to tell her if they were going to come late or not at all to visits and requested that they leave by 8:00 p.m. However, the parents either showed up late or not at all, which disappointed J.A. When the parents did come, the children would like to be outside, but the parents want to stay indoors due to the heat. The parents typically turned on the television, father would fall asleep, and mother would write in her journal and puts iPads in front of the children. Maternal grandmother stated that the parents do not make visits a priority and cancel if something else comes up. If they stay for dinner, they do not help but expect J.A. to help serve them. Father would take food from L.A.'s plate, stating he probably would not eat it anyway.

The CASA concurred in recommending adoption by the maternal grandparents as the permanent plan.

A contested section 366.26 hearing was held June 29, 2021. J.A. was present; L.A. was not. After counsel for father asked for a continuance because J.A. was 10 years old,[2] making this a "more complicated contested" hearing, counsel for the children indicated that J.A. was in favor of adoption. Rather than continue the matter, the juvenile court conducted an informal, unsworn examination of J.A. in chambers with counsel present.

The juvenile court asked J.A. what he thought would be good for him and his brother. J.A. stated that L.A. likes to see their parents and their dogs. He stated that he likes staying at his mother's house because he can see his friends who live close by. But

---

[2] It was subsequently pointed out that J.A. had just turned 11.

12.

he stated that he would not recommend his parents' house "right now" because they needed to get it straightened out and he was worried about L.A. and the pool.

J.A.'s counsel explained that the recommendation was for J.A. to stay with his maternal grandparents and be adopted, which would mean they would act as the parents until he is 18 and L.A. is 18. J.A. stated he was "fine" with that.

When asked what visits were like with his parents, J.A. also described them as "fine," stating his mother journaled and his father played with L.A. and watched television. He also stated they play a board game, take a walk, or talk.

Mother and father's counsel, as well as J.A.'s counsel, all explained to J.A. that, if he and L.A. were adopted, there was a possibility that maternal grandparents could determine that he and his brother could no longer see their parents. J.A. indicated that that would not bother him as the maternal grandparents have said they know what's best for them. Asked if he thought that was true, J.A. stated, "I don't know. Mom and dad, you know, will fight here and there, never around us."

After the discussion with J.A., a colloquy occurred between counsel and the juvenile court. The juvenile court noted that J.A. "obviously" had a connection with mother and father as he had been around them "for a significant portion of his life." Counsel for the children stated that the visits have included a "lot of longing and wishing for things to be better that hasn't happened." The juvenile court noted that mother and father had missed about half of the visits.

The juvenile court stated that the children would not be returned to their parents, but it was a question of whether guardianship or adoption was the better option for them. While the juvenile court thought the children wanted to maintain some sort of contact with the parents and that would likely happen, it could not take that into consideration in its decision.

Counsel for the agency noted the three requirements of the beneficial parent-child relationship exception noting, one, that there had not been consistent contact; two, that

13.

there is some sort of relationship with J.A. due to his age; and three, the question was whether severing the relationship would be detrimental. The juvenile court interjected, stating, it did not think it would be detrimental, and counsel noted that J.A. never mentioned missing his parents, only his friends and dogs.

In open court, counsel for father called maternal grandmother who testified that she supervised the visits and reported monthly to the social worker about the frequency and content of those visits. Maternal grandmother described the inconsistency of their visits, although she had given mother and father discretion to come more often than court ordered. She described J.A. as very aware of their ability to visit and she had to work with him daily as to whether they would come or not.

Mother often did not come because she was working. If she did not come, father would not come either. He finally started coming on his own after "we finally got that in front of the courts." When the parents did not show up, J.A. was "devastated," something that maternal grandmother often shared with the parents.

Father testified that he disagreed with maternal grandmother's count of visitation, stating he had "always gone" to three one-hour visits per week. Father did not want the children adopted because he wanted to be able to take the children with him if he decided to move out of state.

Mother testified that she also did not agree that she had missed approximately 45 percent of her visits. She then said her work and medication schedule were a barrier to regular visitation.

Maternal grandmother was recalled and stated that, during the beginning of the case, mother and father visited "a little bit," then fell behind, but when it came up in court that they weren't visiting, mother and father would bump up their visits. Maternal grandmother recalled that mother called the previous day and stated she wanted to go to the gym and asked, did she "have to go visit today?" Maternal grandmother stated that she left the decision to mother.

14.

In closing, counsel for the children stated that consistency of visitation had been an issue at every court hearing, enough so that the juvenile court made an earlier order that the parents give maternal grandmother 24-hours' notice as to whether they were coming or not. Counsel also pointed out that the quality of the visits was lacking, they were sometimes cut short and hurried, and often not of a parent/child nature.

The juvenile court addressed both of these issues, acknowledging that both consistency and quality of the visits had been a factor throughout the case. In addressing the beneficial parent-child relationship exception, the juvenile court stated:

> "I think there was a history of visits, some inconsistencies, the quality may have not been great, but there were visits. There's no question there's a relationship between the parents and children.… Especially with [J.A.].… Perhaps with [L.A.], it's not quite as strong, but there is a relationship."

The juvenile court then stated that, while J.A. expressed in chambers that he did want to continue visiting his parents, "it's clear to me that what's in the best interest of these children is to choose adoption .…" and "I don't believe it would be detrimental to them to have them be adopted." In terminating mother and father's parental rights, the juvenile court reiterated:

> "As I stated before, the parents were given three years of reunification services. They failed to reunify in those three years and adoption will give them the permanency that the law finds is important for children, that they have a permanent long-term plan and adoptions create that."

## DISCUSSION

Mother argues that we must reverse the order terminating her parental rights as the juvenile court "improperly considered certain facts and circumstances and otherwise failed to properly utilize and follow the teachings and guidance" recently provided by the California Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), decided May 27, 2021. We disagree.

15.

The purpose of a section 366.26 hearing is to select a permanent plan for the child after reunification services have terminated. (§ 366.26, subd. (b).) " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)

"Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see also § 366.26, subd. (c)(1)(B)(i).)

We apply the substantial evidence standard in reviewing the juvenile court's findings on the first two requirements, whether the parent has consistently visited and maintained contact with the child, and whether the relationship is such that the child would benefit from continuing it. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) We review the juvenile court's findings as to the third element, whether there is detriment to the child in severing the relationship, for abuse of discretion. (*Id.* at pp. 640, 641 ["where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards' " of review].)

Mother contends that the juvenile court appropriately found that she met the first criteria of the parent-child relationship exception. We disagree and agree instead with respondent that the juvenile court did not specifically make such a finding or, if it did, that it was not supported by the evidence.

16.

The first requirement of the parent-child relationship exception, regular visitation and contact, is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Visits and contact "'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.]" (*Ibid.*)

As to the first requirement, the juvenile court's statement on the record was, "I think there was a history of visits, some inconsistencies, the quality may not have been great, but there were visits." At the time the children were detained from mother in July of 2018, mother was ordered to have a minimum of three visits a week, two hours each. In December of 2019, when the children were removed from father's custody as well, mother was ordered to have visits two times a week for two hours each. The record before the juvenile court was that mother never approached the threshold of consistent visits within this parameter. Between January and July of 2020, mother attended visits, on average, once per week for 20 visits and missed 40 visits. From July to December 2020, she attended 24 visits but missed 36 visits. During part of that period, mother visited only every two weeks. Following termination of mother's reunification services and before the section 366.26 hearing, mother attended 25 of a possible 45 visits, missing the remainder. In total, mother attended less than half of the allotted visits.

While mother contends that her lack of visits was due to her struggles with mental health issues and effects of her medication, as well as working long hours, there was also evidence that mother did not place a proper emphasis on attending the visits. Maternal grandmother testified that, at one point, mother called to say she wanted to go to the gym instead of attending a visit. Maternal grandmother also testified that mother repeatedly put other factors ahead of visits. This was despite the fact that mother was repeatedly made aware that J.A. struggled when visits were planned, and she failed to attend.

Assuming without deciding that regular visits occurred, we address the second requirement of the parent-child relationship exception. "As to the second element, courts

assess whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The focus is on the child and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Ibid.*)  Focusing on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)  Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," the Supreme Court stated, "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her … visits.' " (*Ibid.*)

Mother contends, and respondent does not disagree, that substantial evidence supports the juvenile court finding of the second requirement of the parent-child relationship exception.  As stated by the juvenile court as it addressed the exception, "There's no question there's a relationship between the parents and children.…  Especially with [J.A.].…  Perhaps with [L.A.], it's not quite as strong, but there is a relationship."

We next address mother's contention that the juvenile court abused its discretion by considering improper factors in its detriment analysis, the third requirement of the parent-child relationship exception.  We disagree.

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  "[C]ourts need to determine ... how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)  Thus, " '[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional

18.

attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid.*)

Mother contends that the juvenile court improperly considered that there was a likelihood that the maternal grandparents, who wished to adopt the children, would allow contact between the children and mother following adoption. We disagree. It is well settled law that a juvenile court may not consider whether visits with the parents are likely to occur in the future in order to discount the parent's assertion of the exception. (*In re C.B.* (2010) 190 Cal.App.4th 102, 127–128; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391.) Here, however, while the trial court did mention that maternal grandparents would likely have contact with mother and therefore the children would as well, it also stated that it was aware of the law and that it was not going to utilize this factor in making its decision.

Mother also contends that the juvenile court abused its discretion when it compared the attributes of life for the children with mother and with maternal grandparents. Not so. As discussed in *Caden C.*, it is improper for a juvenile court to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when weighing whether termination would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The hearing "is decidedly not a contest of who would be the better custodial caregiver," as nothing at the section 366.26 hearing allows the child to return to live with the parent. (*Ibid.*) Here, the juvenile court did not compare mother's attributes as a custodial parent to that of maternal grandparents. Instead, it looked at what the children's lives would look like in the proposed adoptive home and the security and stability that could provide if mother's parental rights were terminated. "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

19.

And finally, mother contends the juvenile court abused its discretion when it improperly held it against mother that she failed to reunify with the children. We disagree. A parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) "The exception preserves the child's right to the relationship even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id.* at p. 643.) However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of whether interaction between parent and child has a negative effect on the child. (*Id.* at p. 637.)

In considering the parent-child relationship exception here, the juvenile court, at one point, stated,

> "The case has been going on for three years. The parents have been offered services, I think it's been about three years in which the parents were given the opportunity to reunify with the children. There was back and forth, and the children were detained. They were placed with the father, they were detained again, and so forth."

We do not find that, in making this statement, the juvenile court abused its discretion. There is no indication that the juvenile court relied on mother's "continued struggles" alone to bar the parent-child relationship exception. Instead, the statement was an accurate recap of the timeline in the case.

We find no abuse of discretion here in terminating mother's parental rights. Even if mother demonstrated both consistent visitation and a beneficial bond with J.A. and L.A., mother has not demonstrated the juvenile court's conclusion was arbitrary or irrational, let alone that this case presents the type of "exceptional circumstance" that would warrant departure from the norm of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 631 [the parent-child exception, like the other statutory exceptions to termination of

20.

parental rights, is a departure from " 'the norm' " of adoption and applies only in " 'exceptional circumstances' "]; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53.)[3]

## DISPOSITION

The order terminating mother's parental rights to J.A. and L.A. is affirmed.

LEVY, Acting P.J.

WE CONCUR:

POOCHIGIAN, J.

MEEHAN, J.

---

**3**     Mother joins in father's related appeal (case No. F083225) and asks that, if we decide in father's appeal that one of the children has a sufficient relationship exception with father to warrant reversal, we also consider the sibling relationship exception to termination of parental rights.  She further argues that, if we conclude reversal is warranted as to father, that the termination of her parental rights also be reinstated. Because we find no error on the part of the juvenile court in father's related appeal, these arguments by mother are moot.